JUDGE KAPLAN

**11 CV 3005**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| AP Services, LLP, in its capacity as Trustee of the CRC Litigation Trust, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>Jerry Silva, Steven Silva, Rosalie Silva, in her capacity as Trustee of the Jody R. Silva Trust, and Jerry Silva and Steven Silva, in their capacity as Co-Trustees of the Jerry Silva 2007 Annuity Trust )<br>)<br>Defendants. ) | **COMPLAINT**<br>**Jury Trial Demanded** |

AP Services, LLP, in its capacity as trustee of the CRC Litigation Trust ("the Trustee"), by and through its undersigned counsel, alleges as follows:

### Nature of the Action

1.  Through this civil action, the Trustee seeks to avoid and recover approximately $106,000,000 of fraudulent transfers made by CRC Parent Corporation (f/n/a Chem Rx Corporation) and its affiliated Debtors (collectively "Chem Rx" or "the Company"). These transfers occurred on October 26, 2007 as part of a leveraged buy out, in which the assets of the Company were leveraged in order to distribute $106,000,000 to Jerry Silva, his son Steven Silva and a number of trusts controlled by them and/or created for their benefit (collectively "the Silvas") ("the LBO Transaction"). Because these transfers were made for worthless stock and because the LBO transaction rendered the Company insolvent and/or left the Company with unreasonably small capital, the transfers are avoidable and may be recovered by the Trustee pursuant to 11 U.S.C. §§ 544(b) and 550 and N.Y. Debtor and Creditor Law §§ 270-281.

**The Parties**

2.      The Trustee is the duly appointed Trustee of the CRC Litigation Trust created pursuant to the confirmed Second Amended Joint Plan of Liquidation for CRC Parent Corporation and Its Affiliated Debtors ("the Plan") which became effective on April 29, 2011. Pursuant to the Plan, all causes of action belonging to the bankruptcy estate (including this avoidance action) were transferred and vested in the Trust on the Effective Date.

3.      Defendant Jerry Silva is a natural person residing in Nassau County, New York. Prior to its liquidation, Jerry Silva was the chief executive officer of Chem Rx and chair of its board of directors. As part of the LBO transaction, Jerry Silva and trusts of which he is a trustee or beneficiary received at least $85,153,772 from Chem Rx ($28,464,882 paid to Jerry Silva individually, $44,934,443 paid to Jerry Silva as Life Tenant, and $11,754,447 as co-trustee of the Jerry Silva 2007 Annuity Trust).

4.      Defendant Steven Silva is a natural person residing in Nassau County, New York. Prior to its liquidation, Steven Silva was Chem Rx's chief operating officer and a member of its board of directors. As part of the LBO transaction, Steven Silva and trusts of which he is a trustee or beneficiary received at least $71,309,141 from Chem Rx ($14,620,251 paid to Steve Silva individually, $44,934,443 paid to Jerry Silva as Life Tenant with Steven Silva as Remainderman, and $11,754,447 as co-trustee and beneficiary of the Jerry Silva 2007 Annuity Trust).

5.      Defendant Rosalie Silva is the trustee of the Jody R. Silva Trust, a trust which is believed to have its principal place of administration in Nassau County, New York. As part of the LBO transaction, the Jody R. Silva Trust received at least $6,225,977 from Chem Rx.

6. Defendants Jerry Silva and Steven Silva were the co-trustees of the Jerry Silva 2007 Annuity Trust, a trust which is believed to have its principal place of administration in Nassau County, New York. As part of the LBO transaction, the Jerry Silva 2007 Annuity Trust received at least $11,754,447 from Chem Rx. Upon information and belief, the Jerry Silva 2007 Annuity Trust terminated in May 2009 and the corpus of that trust was distributed to Steven Silva.

### Jurisdiction and Venue

7. This Court has jurisdiction pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising under Title 11 of the United States Code, or arising in or related to cases under title 11 of the United States Code.

8. Venue is proper under 28 U.S.C. §§ 1391(b) and 1409(c) as a substantial part of the events giving rise to this cause of action occurred within this judicial district.

### Factual Background

**A.     Overview of the Company**

9. The Company was founded in 1958 by Jerry Silva as a single retail pharmacy in Long Island, New York, initially serving individual customers with their prescriptions. Through organic growth and selective acquisitions, the Company grew into the third largest long-term care pharmacy in the United States, serving a wide range of long-term healthcare institutions. Prior to its liquidation, the Company served more than 400 accounts, providing pharmacy services to residents of skilled nursing homes, adult homes, group homes, assisted living facilities, addiction treatment centers, and correctional institutions. The Company was based in Nassau County, New York.

10. The Company conducted their business through wholly owned operating subsidiaries which would purchase pharmaceuticals in bulk quantities from wholesalers and

manufacturers and dispense both prescription and non-prescription drugs in patient specific packaging in accordance with physician orders.

### B. The Leveraged Buyout Transaction ("LBO Transaction")

11. The Silvas were the Company's principal shareholders until October 26, 2007. That was the date in which the Silvas sold their stock as part of the LBO Transaction. This LBO Transaction involved the sale of the Silvas' stock in the Company to an acquisition vehicle known as Paramount, which was then immediately merged with the Company's predecessor in interest and the combined company changed its name to Chem Rx.

12. In exchange for the Silvas' stock, the Company paid $106,000,000 of cash to the Defendants.

13. In order to fund this purchase, and otherwise effectuate the LBO Transaction, the Company entered into First and Second Lien Credit Agreements in an aggregate amount of $177,000,000.

14. This increased the Company's debt significantly above historical levels.

15. These high debt levels caused concern to a number of third parties who would have a financial interest in the Company following the consummation of the LBO Transaction.

16. Specifically, AmeriSouce Bergen Drug Company ("ABDC"), which was the Company's largest supplier and trade creditor demanded that the Company post $11 million in security (in the form of a letter of credit or cash deposit) to secure the Company's obligations to ABDC following consummation of the LBO Transaction. ABDC threatened to sever its relationship with the Company following the LBO Transaction unless this security was in place.

4

17. In order to ensure the LBO Transaction went forward, and to avoid disclosing ABDC's request to other creditors, Steven and/or Jerry Silva agreed to pay the requested $11 million cash deposit out of their personal funds.

18. In addition, a number of Paramount shareholders (whose approval was required for consummation of the LBO Transaction) threatened to block the LBO Transaction unless the Silvas agreed to give them put options which allowed these shareholders to sell their interest in the Company back to the Silvas for a set price following the LBO Transaction. Again, in order to ensure the LBO Transaction occurred, the Silvas agreed to provide the requested options.

C. **The Bankruptcy Filing**

19. The concerns about these high debt levels proved well founded. Following the LBO Transaction, the Company's business was unable to support these new levels of debt. Indeed, just 14 months after the LBO Transaction was consummated, the Company violated its loan covenants and was in default with its lenders. After failing to reach a consensual restructuring with its lenders, the Company filed for bankruptcy on May 11, 2010.

20. This bankruptcy ultimately led to the liquidation of Chem Rx and the creation of the Trust that is the Plaintiff in this action. The proceeds of Chem Rx's liquidation were far less than that necessary to satisfy its debts. At the time of its bankruptcy the Company had over $56,000,000 of general unsecured claims, plus any potential secured lender deficiency claims. The litigation trust was created for the purpose of prosecuting estate causes of action and the proceeds of these causes of action are the only source of recovery for general unsecured creditors.

## COUNT I

**(Count to Avoid and Recover Fraudulent Transfers and/or Obligations Incurred Pursuant to 11 U.S.C. §§ 544(b) and 550 and N.Y. Debtor and Creditor Law §§ 270-281)**

21.     The Trustee repeats and incorporates by reference paragraphs 1 through 20 as if fully set forth herein.

22.     Pursuant to sections 544(b) and 550 of the Bankruptcy Code and the Plan, the Trustee may avoid any transfer of an interest of the Debtors in property that is voidable under applicable state law by a creditor holding an unsecured claim and may recover the property transferred, or the value of such property, for the benefit of the bankruptcy estate and its creditors.

23.     The applicable state law pursuant to which the payments made to the Silvas are avoidable is the New York Debtor and Creditor Law.  Pursuant to section 278 of Article 10, of that law, a creditor may set aside any conveyance or annul any obligation which is fraudulent, to the extent necessary to satisfy its claim.

24.     The payments made to the Silvas as part of the LBO Transaction rendered the Company insolvent and were therefore fraudulent as to other creditors pursuant to section 273 of Article 10, because the Company did not receive fair consideration for these transfers.

25.     Alternatively, the payments made to the Silvas as part of the LBO Transaction left the Company with unreasonably small capital to support its future obligations and the transfers were therefore fraudulent as to other creditors because the Company did not receive fair consideration for these transfers.

26.     The payments of more than $106,000,000 in cash to the Silvas in exchange for their stock in the Company was not for fair consideration because the actual value of the stock

was far less than the $106,000,000 cash consideration paid. Indeed, because the LBO Transaction rendered the Company insolvent, the Silvas' stock was worthless.

27. At least one actual creditor exists that could avoid the transfers made and/or obligations incurred by the Debtors in conjunction with the execution of the Prepetition Credit Agreement under Article 10.

28. Defendants are initial transferees within the meaning of section 550 of the Bankruptcy Code.

WHEREFORE, the Trustee demands judgment against the Silvas, as follows:

(a) $106,000,000 on its claim for money damages against Defendant Jerry Silva, Defendant Steven Silva, Defendant Rosalie Silva, as trustee of the Jody R. Silva Trust, and Defendants Jerry Silva and Steven Silva, as co-trustees of the Jerry Silva 2007 Annuity Trust;

(b) for attorneys' fees; and

(c) such other relief as the Court finds just and proper.

WHITE & CASE LLP

Douglas P. Baumstein (DB-1948)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: 212 819-8200
Facsimile: 212 354-8113

*Attorneys for AP Services, LLP, as Trustee*