UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
AP SERVICES LLP, in its capacity as Trustee of the CRC
Litigation Trust,

               Plaintiff,

        -against-                               11 Civ. 3005 (LAK)

JERRY SILVA, STEVEN SILVA, ROSALIE SILVA,
in her personal capacity and as Trustee of the Jody R. Silva
Trust, and JERRY SILVA and STEVEN SILVA, in their
capacity as Co-Trustees of the Jerry Silva 2007 Annuity Trust,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Andrew M. Leblanc
> MILLBANK, TWEED, HADLEY & MCCLOY LLP
> *Attorney for Defendant Jerry Silva*
>
> Patrick T. Collins
> Ted A. Berkowitz
> FARRELL FRITZ, P.C.
> *Attorney for Defendant Steven Silva*
>
> Matthew D. Kane
> Bijan Amini
> STORCH AMINI & MUNVES PC
> *Attorney for Defendant Rosalie Silva*
>
> Jason N. Zakia
> Douglas P. Baumsteim
> Adam M. Burton
> WHITE & CASE LLP
> *Attorney for Plaintiff AP Services, LLP*

LEWIS A. KAPLAN, *District Judge.*

This is an action brought by the trustee of the CRC Litigation Trust (the "Trustee"), an entity created by the bankruptcy court to pursue claims on behalf of the bankrupt estate of Chem Rx Corporation ("CRC" or the "Company"), to avoid and recover transfers, and for other relief, in connection with a 2007 leveraged buyout of CRC's predecessor in interest. It is brought under Sections 554(b) and 550 of the Bankruptcy Code and the New York Debtor & Creditor Law.

*Facts*

Defendant Jerry Silva founded  B.J.K. Inc, a New York corporation doing business as Chem Rx[1] ("Chem Rx"), in 1958 and grew it from a single retail pharmacy to the third largest long-term care pharmacy in the United States.[2] Jerry Silva served as its chief executive officer and the chair of its board of directors.[3] His son, Steven, was the chief operating officer and a member of the company's board of directors.[4]  Jerry's wife, Rosalie Silva, was the trustee of the Jody R. Silva trust.[5]

---

[1]     DI 15, Ex. A.

[2]     SAC ¶ 15.

[3]     *Id.* ¶ 9.

[4]     *Id.* ¶ 10.

[5]     *Id.* ¶ 11.

2

On October 26, 2007, the Silvas, Chem Rx's principal shareholders,[6] sold their shares to Paramount Acquisition Corporation ("Paramount"), a "blank check acquisition vehicle formed and funded . . . for the express purpose of effectuating a business combination with an entity operating in the health care industry,"[7] as part of a leveraged buy out ("LBO"). Paramount then merged with Chem Rx, and the surviving company's name was changed to Chem Rx Corporation ("CRC").[8]

The second amended complaint ("SAC") alleges that the LBO consisted of two parts: (1) the sale of the Silvas' stock, pursuant to a Stock Purchase Agreement ("SPA"), to Paramount, and (2) the financing for that stock purchase, which was provided pursuant to credit agreements into which Paramount entered to effectuate the LBO.[9] The SAC alleges that the closing of the SPA was contingent upon Paramount obtaining the financing to fund the stock purchase.[10] To do so, Paramount entered into credit agreements with lenders that loaned it $177 million, which was paid to CRC on the date of the LBO[11] and used to by the Silvas' stock.[12]

The Trustee claims that the Silvas, in order to secure the loans to CRC, prepared

---

[6]

    *Id.* ¶ 17.

[7]

    DI 41, Ex. 1 at ¶ 2; SAC ¶ 17.

[8]

    SAC ¶ 18.

[9]

    *Id.* ¶ 17; DI 15, Ex. A, at 1; *see also* DI 22 Exs. 2, 3.

[10]

    *Id.* ¶ 19.

[11]

    DI 15, Exs. 2, 3.

[12]

    SAC ¶ 20.

documents – which were presented to prospective lenders – that misstated Chem Rx's historical financial performance and "proffered unreasonable future projections for [CRC] based on false financial data."[13]  In fact, the Trustee claims, the Silvas "knew that the Company could not actually support the debt levels to be incurred in connection with the LBO Transaction and that the Company would be left with unreasonably small capital and unsustainable levels of debts."[14]  The lenders allegedly relied on this misinformation, and CRC used the proceeds from the loans to pay the Silvas $106 million for their stock.[15]  Jerry and Steven Silva continued to serve as officers and members of CRC's board of directors.[16]

In the year following the LBO, CRC violated its loan covenants and was in default on its obligations.[17]  It filed for bankruptcy in 2010, three years after the LBO, and ultimately was liquidated.[18]

The Trustee makes essentially two claims: that (1) that the payments made by

---

[13]

DI 22, at 5.  For example, the Trustee claims the Silvas misstated Chem Rx's reserve for bad debt expense, which was in fact "grossly inadequate" to support the debt levels to be incurred.  *Id.*  Indeed "[o]nly a few months after the LBO Transaction closed, the Company was forced to revise its bad debt allowance by nearly threefold to account more accurately for the collectability of debts."  *Id.*

[14]

*Id.* at 6.

[15]

SAC ¶¶ 36, 41.

[16]

*Id.* ¶ 19.

[17]

SAC ¶¶ 45-48.  The SAC alleges also that, following the LBO, "Jerry and Steven Silva wasted the Company's limited cash by deciding to improve their personal standing in the community by embarking on a charitable giving spree," donating nearly $4 million in charity during years when CRC suffered massive losses.  *Id.* at ¶ 55.

[18]

*Id.*  ¶¶ 58, 59.

4

Paramount to the Silvas in exchange for their stock were fraudulent transfers, as they were made with actual intent to defraud CRC's creditors and, in any case, without fair consideration and rendered CRC insolvent or left the company with unreasonably small capital to supports its future operations,[19] and (2) that the Silvas breached their fiduciary duties to CRC by mismanaging the company and causing it to incur debt they knew it could not repay.  Count One of the SAC seeks to avoid and recover the transfers made to the Silvas as part of the LBO.[20]  Counts Two and Three seek damages against Jerry and Steven Silva for breaching their fiduciary duties to CRC and aiding abetting one another's breaches of fiduciary duty.[21]  Count Four seeks damages against Rosalie Silva for aiding and abetting the breaches of fiduciary duty by Jerry and Steven.[22]  Count Five is for unjust enrichment against all of the defendants.[23]

The Silvas argue that all of the Trustee's claims are barred by the securities settlement payment safe-harbor provision of the federal Bankruptcy Code, 11 U.S.C. § 546 (e), and, in any event, are not adequately pleaded.[24]

## *Discussion*

---

[19]    *Id.* ¶¶ 58, 59.

[20]    *Id.* ¶¶ 60-68.

[21]    *Id.* ¶¶ 69-92.

[22]    *Id.* ¶¶ 93- 103.

[23]    *Id.* ¶¶ 104-108.

[24]    *See* DI 41.

## I.    The Standard

To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."[25]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[26]  The Court accepts as true all well-pleaded factual allegations, and "draws all inferences in the plaintiff's favor."[27]  In deciding a motion to dismiss, a court considers the complaint and "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[28]

## II.    Avoidance of the Transfer

Section 544(b) of the Bankruptcy Code allows a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding any unsecured claim . . . ."[29]  The "applicable law" in this case

---

[25]

     *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[26]

     *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).

[27]

     *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (internal quotation marks and citation omitted).

[28]

     *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[29]

     11 U.S.C. § 544(b)(1).  Moreover, the Trustee's claim that the payments made to the Silvas as part of the LBO "were made with actual intent to defraud creditors," SAC ¶ 63,  is subject to the heightened pleading requirement of Rule 9(b).  For the reasons discussed

6

is the New York Debtor and Creditor Law, which, *inter alia*, allows a creditor to set aside any fraudulent conveyance "to the extent necessary to satisfy his claim."[30]  Section 546(e) of the Bankruptcy Code, however, exempts "settlement payments" from avoidance:

> "Notwithstanding section[] 544 . . . of this title, the trustee may not avoid a transfer that is a . . . settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7) . . . ."[31]

The Bankruptcy Code defines a "securities contract" as a "contract for the purchase, sale or loan of a security,"[32] and a settlement payment as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[33] Circuit courts, seeking to clarify this circular definition, have made clear that "a settlement payment is generally the transfer of cash or securities made to complete a securities transaction."[34]

---

below, however, the Court need not determine whether the Trustee has adequately pleaded its claim.

[30]

N.Y. DEBT. & CRED. LAW § 278.

[31]

11 U.S.C. § 546(e).

[32]

11 U.S.C. § 741(7)(A)(I).

[33]

11 U.S.C. § 741(8).

[34]

*Resorts Int'l Fin. Inc. v. Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999); *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 (10th Cir. 1991).

The fundamental issue thus is whether the payments made to the Silvas as part of the LBO fit within the language of the statute and courts' understanding of what constitutes a settlement payment. Several circuit courts have held that a "payment made for shares during an LBO is obviously"[35] a "commonly used securities transaction"[36] and therefore fits within the statute's definition of a settlement payment. The Trustee argues, however, that, even when made as part of an LBO, payments for securities are "settlement payments" only when they pass from the purchaser of the securities through a financial intermediary to the seller. Because the payments here were made directly from Paramount to the Silvas' bank accounts and there was no "securities clearing agency or other financial institution in the middle of the transaction," the payments do not fit within Section 546(e).[37]

A number of courts indeed have held that, in order for a payment in a securities transaction to constitute a "settlement payment" for purposes of Section 546(e), it must travel through the "settlement payment system," in which a financial intermediary – generally a securities clearing house – takes title to and a beneficial interest in the securities.[38]   In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V*, however, the Second Circuit rejected any such requirement, holding that payments for securities were "settlement payments" even where "no financial intermediary took a beneficial interest in the exchanged securities during the course of the

---

[35]

     *Resorts*, 181 F.3d at 516.

[36]

     11 U.S.C. § 741(8); *see also Kaiser Steel*, 952 F.2d 1230, 1239-40; *QSI Holdings*, 571 F.3d at 549-550; *Plaissen*, 590 F.3d at 258.

[37]

     DI 22, at 11.

[38]

     *See Munford, Inc. v. Valuation Research Corp.*, 98 F.2d 604, 610 (11th Cir. 1996).

8

transaction."[39]  In so doing, moreover, it relied upon decisions of three other circuits that affirmed "application of the safe harbor to leveraged buyouts of private companies that involved financial intermediaries who served only as conduits."[40]  Indeed, the Second Circuit referred with approval to their view that the purpose of the safe harbor rule was served by applying it to LBOs because "undoing long-settled leveraged buyouts would have a substantial impact on the stability of the financial markets, even though only private securities were involved and no financial intermediary took a beneficial interest in the exchanged securities during the course of the transaction."[41]

The Trustee contends that *Enron* cannot be expanded to apply to situations such as this one, in which the funds were transferred directly to the Silvas' banks and did not "pass[] through a clearinghouse or [similar] intermediary,"[42] pointing out that the securities and payments in that

---

[39]

651 F.3d 329, 338 (2d Cir. 2010).  *Enron* involved Enron's redemption of commercial paper from individual noteholders, which occurred through a clearing agency.  The clearing agency, however, did not take title to or a beneficial interest in the securities during the course of the transaction.  Enron argued that the transactions were not "settlement payments" and the safe harbor did not apply because the clearing agency merely "acted as a conduit and recordkeeper."  *Enron*, 651 F.3d at 339.  The court disagreed, noting that Section "546(e) applies to settlement payments made by or to (or for the benefit of) a number of participants in the financial markets. It would appear inconsistent with this language for courts to limit the safe harbor circuitously by interpreting the definition of 'settlement payment' to exclude payments that do not involve a financial intermediary that takes title to the securities during the course of the transaction."  Regardless of whether a financial intermediary took a beneficial interest in the securities, the court noted, undoing Enron's redemption payments would "have a substantial and . . . negative effect on the financial markets."  *Id.*

[40]

*Id.* (citing *In re Plassein Int'l Corp.,* 590 F.3d 252, 257-59 (3d Cir. 2009); *In re QSI Holdings, Inc.,* 571 F.3d 545, 549-50 (6th Cir. 2009); *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009)).

[41]

*Enron*, 65 F.3d at 338 (footnote omitted).

[42]

DI 22, at 12.

9

case did pass through a clearing agency. Eliminating the requirement that the securities pass through a financial intermediary, the Trustee argues, "would effectively eliminate the financial institution limitation from Section 546(e), since all settlement payments will either originate from, or eventually be deposited with a financial institution."[43]

The Silvas counter that the payments they received for their stock were "settlement payments" – payments "made to complete a securities transaction,"[44] – which were made by wire transfer into their bank accounts.[45] To trigger the safe harbor, Section 546(e) requires only that such "settlement payment[s] . . .[be] made by or to . . . a commodity broker, forward contract merchant, stockbroker, [or] financial institution."[46] The statute defines a financial institution as, *inter alia*, "a Federal reserve bank, or an entity that is a commercial or savings bank, industrial savings bank, [or] savings and loan association . . . ."[47] Defendants argue that the transactions are protected by the safe harbor because the settlement payments were made to the Silvas' banks.

Defendants are correct. The plain language of Section 546(e),[48] coupled with the

---

43

      *Id.* at 18.

44

      *Resorts Int'l,* 181 F.3d at 515.

45

      The Silvas cite the SPA, which is a public document and is incorporated by reference into and relied upon in the complaint, *see* SAC ¶¶ 17, 19, n.3, to show that the payments were made to the Silvas' banks. Indeed, the SPA provides that payments to the sellers were to be made "by wire transfer . . . to bank accounts designated in writing by the Sellers." DI 15 Ex. A at A-1; DI 15, at 13-14.

46

      11 U.S.C. § 546(e).

47

      11 U.S.C. § 101(22).

48

      "[T]he trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, [or]

10

general understanding among the courts of appeal that the definition of "settlement payment" should be construed "extremely broad[ly],"[49] indicates that the transaction fits within the safe harbor. While it is true, as the Trustee points out, that a financial institution served as an intermediary in the transactions (though it did not take a beneficial interest in the securities) in the majority of cases in which courts have applied Section 546(e),[50] nothing in the language of the statute or the post-*Enron* case law indicates that an intermediary is necessary to trigger the safe harbor. Indeed, the Third Circuit in *In re Plassein International Corporation* – a case with facts similar to those present here – held that LBOs in which payments were made directly to shareholders' bank accounts via wire transfer fell within Section 546(e).[51] Moreover, the Second Circuit in *Enron*, as we have seen, took pains to point out that the application of the safe harbor rule to preclude unwinding of long-settled leveraged buyouts was consistent with the statute's underlying policy of avoiding undesirable impacts on the financial markets. This is equally true regardless of whether a payment passed through a financial intermediary.

The Trustee nevertheless argues that the transaction here – "[a] wire transfer from the company to five Defendants" – implicates none of the concerns cited by the Second Circuit in

---

financial institution."  11 U.S.C. § 546(e).

[49]

In re Resorts Int'l, Inc., at 515-16 (3d Cir. 1999) ("The general thrust of *Kaiser Steel* . . . is that the term 'settlement payment' is a broad one that includes almost all securities transactions.").

[50]

See, e.g., *QSI Holdings*, 571 F.3d at 548 (bank acted as exchange agent); *Contemporary Indus. Crop v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009) (bank served as escrow agent); *Kaiser Steel Corp*, 952 F.2d at 1235-36 (bank acted as disbursing agent); *In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 88 (D. Del. 2002) (same).

[51]

In re Plassein Int'l Corp., 590 F.3d 252, 258 (3d Cir. 2009) (rejecting argument that "settlement payments must travel through the settlement system").

*Enron*, *i.e.*, that undoing the payments would substantially and negatively affect the financial markets.[52]  Allowing the Trustee to undo the payments made to the Silvas, the Trustee argues, would have no such effect.

Every circuit court but one to address this argument has rejected it, holding instead that Section 546(e) is "not limited to publicly traded securities but also extends to transactions, such as the leveraged buyout at issue here, involving privately held securities."[53]  Indeed, the LBOs in *Plassein* each involved securities that had been "privately held [by] a few shareholders."[54]  The Eighth Circuit applied Section 546(e) to an LBO in which a single family of controlling shareholders received $26.5 million in exchange for their stock.  The court held that "particularly because so much money is at stake, we question [plaintiff's] assertion that the reversal of the payments—at least a portion of which were probably reinvested—would in no way impact the nation's financial markets. At the very least, we can see how Congress might have believed undoing similar transactions *could* impact those markets, and why Congress might have thought it prudent to extend protection to payments such as these."[55]  The same can be said for the situation here, in which the Silvas received $106 million in exchange for their stock.

Finally, the Trustee's contention that the safe harbor should not apply here because

---

[52]    DI 22, at 13.

[53]    *QSI Holdings*, 571 F.3d at 547; *see also Frost, 564 F.3d at 986; Plassein*, 590 F.3d at 258-59.

[54]    *Plassein*, 590 F.3d at 255; *see also In re Hechinger Inv. Co. of Delaware*, 274 B.R. 71, 76 (D. Del. 2002) (applying § 546(e) to LBOs in which shareholders who received payments for their stock consisted of a single family).

[55]    *Contemporary Indus.*, 564 F.3d at 987.

12

upsetting this LBO would not disrupt financial markets is at war with the Second Circuit's rationale for rejecting a different argument advanced in *Enron*. In that case, the plaintiff contended that the payments there at issue were not "settlement payments" on the theory that the payments were not "similar payment[s] commonly used in the securities trade" within the meaning of Section 741(8) of the Bankruptcy Code. The Court of Appeals rejected the argument because it was unwilling to construe the statute to "make application of the safe harbor in every case depend on a factual determination regarding the commonness of a given transaction."[56] Such a construction, it said, "would result in commercial uncertainty and unpredictability at odds with the safe harbor's purpose and in an area of law where certainty and predictability are at a premium."[57] The Trustee's position here, if adopted, however, would require a factual determination in each case as to whether upsetting a concluded LBO would have an adverse effect on the financial markets, thus casting all or at least many such transactions into uncertainty. In view of the Second Circuit's reasoning in *Enron,* that course is not properly open to this Court.

Given the plain language of the statute, the circuit courts' agreement that it should be construed broadly, and the Second Circuit's decision in *Enron*, the Court determines that the payments made in exchange for the Silvas' stock were settlement payments and are protected from avoidance by Section 546(e).

Count One is dismissed.

III.     *Common Law Claims*

---

[56]

    *Id.* at 336.

[57]

    *Id.*

In addition to seeking to set aside the allegedly fraudulent transfers, the Trustee seeks damages for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty, as well as recovery on an unjust enrichment theory.

The Silvas argue that the Trustee's common law claims are "mere attempts at artful pleading to evade Section 546(e), are preempted by the statute, and should be dismissed.[58]  They claim that this evidenced by the fact that the Trustee (1) did not bring its suit in Delaware, where the bankruptcy proceeding was initiated, because the Third Circuit has made clear that Section 546(e) would foreclose its avoidance claims, and (2) amended its complaint shortly after *Enron* to add common law claims "to what had been a one-count complaint alleging only constructive fraudulent transfer."[59]  The Silvas argue also that, even if the common law claims are not preempted by Section 546(e), they are not adequately pleaded and must be dismissed.

### A.    *The Unjust Enrichment Claim*

The SAC alleges that the "defendants were substantially enriched by their receipt of money transfers from the LBO Transaction, while the Company suffered substantial harm as a result of the LBO Transaction."[60]  The Silvas "should not be rewarded for orchestrating the LBO Transaction," and thus "equity demands disgorgement of the[] monies from the defendants."[61]

---

[58]  DI 15, at 15.

[59]  DI 15, at 16.

[60]  SAC ¶ 106.

[61]  *Id.* at ¶ 108.

14

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the contrary notwithstanding."[62] Thus, "[i]n the absence of express congressional command, state law is pre-empted if that law actually conflicts with federal law . . . or if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it'."[63]

The Trustee's claim for unjust enrichment is preempted by Section 546(e). The unjust enrichment claim "seeks to recover the same payments . . . held . . . unavoidable under § 546(e)."[64] Indeed, "[a]llowing recovery for unjust enrichment . . . would implicate the same concerns regarding the unraveling of settled securities transactions . . . which is precisely the result that section 546(e) precludes."[65] The Court could not permit the unjust enrichment claim to go forward

---

[62]

U.S. Const. art. VI, cl. 2

[63]

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (quoting *Fidelity Fed. Sav. & Loan Assn. V. De la Cuesta*, 458 U.S. 141, 153 (1982)).

[64]

*Contemporary Indus.*, 546 F.3d at 988 (dismissing unjust enrichment and illegal and/or excessive shareholder distributions claims because "[a]llowing recovery on these claims would render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section.").

[65]

*In re Hechinger*, 274 B.R. at 96; *see also Contemporary Indus.*, 546 F.3d at 988. In one case has a court in this circuit declined to find a claim for unjust enrichment preempted by § 546(e). *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 450 (Bankr. S.D.N.Y. 2012). In *Lehman*, however, Magistrate Judge Peck made clear that "[the *Lehman* bankruptcy] litigation is different" from *Hechinger* and *Contemporary Industries*, where the "unjust enrichment claims were identical to the plaintiffs' constructively fraudulent transfer claims under the Bankruptcy Code and also were based upon the same facts as these constructive fraud claims . . . . [By contrast,] [t]he claims that [plaintiff] argues should be preempted by federal bankruptcy law are unlike classic avoidance claims for constructively fraudulent transfers. Instead, these claims have more in common with claims grounded in actual fraudulent intent." *Id.* In this case, like in *Hechinger* and *Contemporary Industries*,

15

without frustrating the purpose of Section 546(e).  The unjust enrichment claim (Count Five) is thus dismissed.

B.      *The Remaining Common Law Claims*

The Silvas contend that the claims for breaches of fiduciary duty and aiding and abetting breaches of fiduciary duty also are preempted because they "seek[] the relief barred by section 546(e)."[66]  This argument does not withstand analysis.  In contrast to a claim for unjust enrichment, for which the remedy would amount to avoidance of the transfer, claims for breach of fiduciary duty and aiding abetting a breach of fiduciary duty seek money damages.[67]  Payment of money damages would not implicate the danger against which Section 546(e) is intended to protect – unwinding settled securities transactions.

Having dismissed the only claim based in federal law, however, the Court declines to exercise jurisdiction over the remaining common law claims.  The claims for breach of fiduciary duty (Count 2) and aiding and abetting breach of fiduciary duty (Count 3 and Count 4) thus are dismissed without prejudice.[68]

_____

the Trustee alleges that "[a]ll defendants were substantially enriched by their receipt of money transfers from the LBO transaction" – the exact allegations that underlie its attempt to avoid the transfer under the Bankruptcy Code.  *Compare* SAC ¶¶ 63-66 *with* ¶ 106.

[66]     DI 24, at 5.

[67]     *In re Hechinger*, 274 B.R at 89 n.8 ("Whereas the remedy for a fraudulent transfer claim is avoidance of the transfer and recovery from the transferee, the remedy for breach of fiduciary duty claim is a money judgment against the directors and their aiders and abettors.").

[68]     *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988) ("when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.");

16

*Conclusion*

Defendants' motion to dismiss the action [DI 41] is granted in all respects. The dismissal of Counts One and Five is on the merits. The dismissal of the remaining claims is for lack of subject matter jurisdiction. The Clerk shall enter judgment and close the case.

SO ORDERED.

Dated:        November 7, 2012

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").